IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
December 9, 2004 Session

## SANDRA JANE LaGUARDIA v. MICHAEL J. LaGUARDIA

**Direct Appeal from the Chancery Court for Washington County**
**No. 7727     Hon. G. Richard Johnson, Judge**

**No. E2004-00822-COA-R3-CV - FILED JULY 6, 2005**

In this divorce action, the Trial Court awarded the wife custody of the children with visitation to the husband, set child support and alimony *in futuro* to the wife, and divided the marital property. As per the marital property division, the wife was awarded 60% interest in the marital home and the husband 40%, with the right of the mother to remain in the home until the children reach age 18, and the husband was required to pay for the upkeep of the home. Further the wife was ordered to pay 40% of the taxes and insurance and the husband 60% until the property was sold. On appeal we affirm the Trial Court's Judgment with modifications. The husband will be allowed to utilize a care taker, if necessary, during visitation; the marital home will be sold within two years and the proceeds divided as decreed by the Trial Court. Following the sale the Trial Court is instructed to determine a new amount and duration of the alimony award.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed, as modified.**

HERSCHEL PICKENS FRANKS, P.J., delivered the opinion of the court, in which SHARON G. LEE, J., joined, and CHARLES D. SUSANO, JR., J., dissented in part and filed an Opinion.

Judith Fain, Johnson City, Tennessee, for appellant.

Richard W. Pectol and Jeffrey P. Miles, Johnson City, Tennessee, for appellee.

### OPINION

In this divorce action, the appellant husband raises 12 issues for review, which we group as follows:

1.	Issues regarding the Permanent Parenting Plan, including allocation of parenting time, decision making, and supervision of the children.

2.	Issues pertaining to the marital residence: specifically, allowing wife to remain in home until the children are 18 and onerating husband with responsibility for repair expenses and maintenance.

3.	Issues regarding property division as to characterization and award, including the finding of marital equity in husband's separate residence.

4.	The valuation of investment accounts.

5.	The award of alimony *in futuro*.

In addition, the wife appeals the characterization of husband's law practice and the Paine Webber account as husband's separate property.

This divorce case dissolved an 18 year marriage. Proceedings were protracted and a myriad of issues were hotly contested. Complicating factors involved the special needs of autistic twin daughters (now age 6) and the unusual financial circumstances.

Husband worked in his father's business from age 12 or 13, and graduated from college in three years while continuing to work full-time. He rose through the ranks of the family business and acquired stock in the company via gifts from his parents and also by purchase from his siblings. When the business was sold in 1984 husband received approximately 1.3 million for his stock. After taxes, he used a large portion of his money to build a luxurious home on lakefront property, and invested the balance of approximately $790,000.00. The home was completed in March 1985 and is debt-free, except for a $60,000.00 balance on an equity line of credit. The Chancellor placed a value on the home of $600,000.00.

Having dropped out of college after one semester, the wife was working as a bank teller when she met husband. Her work history was comprised of clerical positions and some fashion modeling. The parties were wed in July of 1985 after a short courtship. For the next six years, they lived by all accounts a life of leisure, on the husband's investment assets. Husband encouraged wife during this time to return to college, and she graduated with a degree in fashion merchandising. During this period the husband briefly ventured into a sporting goods business with his brother, and also a computer service business. Neither venture was financially successful. The wife did some minor modeling work and helped out at a friend's retail clothing shop for a brief period. The parties dispute to what extent the husband wanted the wife to work outside the home.

The husband handled the finances, which became a major source of friction throughout the marriage. The wife consistently spent money beyond the budget the husband had

endeavored to establish, requiring him on several occasions to pay off her high credit card balances. Another problem in the marriage, was the wife's excessive drinking. While there are documented incidents of emergency room visits for dehydration and alcohol poisoning, the Trial Court found that the wife was not an alcoholic.

The husband entered law school at the University of Tennessee in 1991, but the parties' standard of living changed little. The husband's father paid the law school expenses and provided other financial assistance. The wife refused to move to Knoxville and during the first semester, husband had a brief affair with a classmate. The wife was predictably very upset about this affair, and was described as having a near nervous breakdown. As part of the reconciliation, husband gave up his apartment in Knoxville and commuted during the rest of law school, but the wife assisted with the driving. He also added the wife's name on the marital residence as tenants by entireties in November or December 1991. There was some discussion about putting her name on the husband's investment accounts, but he ultimately decided against it. However, wife telephoned husband's investment advisor and told him to put her name on the investment accounts, an action which the Trial Court characterized as "a mistake." The advisor changed the account without the authority of the husband, and without his authority designating the wife as his agent. When this was discovered, the husband instructed his broker to remove the wife's name, and thereafter the investment accounts remained in his name only.

After graduation in 1994 husband was employed as an assistant district attorney, but the parties maintained their standard of living well in excess of his modest salary, which they supported and supplemented with his separate assets. Shortly after he was terminated from the District Attorney position he opened his own practice, which is a practice specializing in criminal defense.

When the wife became pregnant in 1998, she became extremely distraught, as she never wanted children, and expressed to other people that she didn't want the children and that the pregnancy was an accident. Anastasia and Angelique were born in May 1999, and she expressed these sentiments on multiple occasions after the children were born.

Husband's father paid for round the clock care-givers for the first four months, and after that, they had daytime help for 60-70 hours a week until the twins were 16 or 18 months old.

According to the husband, when the full-time help was stopped, the wife threatened to leave him and the daughters because of all the stress. Husband testified that when he asked what she would tell the girls, she replied, "I'll tell them I gave them life. That's enough." The husband convinced her to stay because he wanted his children to know their mother. (The wife did not refute this testimony in her rebuttal proof.)

Ultimately the proof shows that the wife has now accepted and adjusted to a role as a mother, and lay witnesses described her as a good mother, attentive and bonded with the children. The expert witnesses testified that "both parents are helpful, firm, caring and attentive with both of

the girls". They had no criticism of either parent's skills, but hastened to declare that they were not in the role of professionally assessing the parenting skills.

The daughters were diagnosed with autism spectrum disorder at about age two. Autism is a severe developmental and neurological disorder. The twins' impairment is considered to be of milder severity. Angelique is more impaired than Anastasia. To their credit, the parties have diligently sought out the best treatment specialists and experts, and they are committed to providing early and intensive therapy for the children. The twins attend special schools with specialized programs for early intervention in autism disorders. They are said to be making excellent progress, although the ultimate prognosis is unclear. By the date of the post-trial proceeding, they had been attending a regular pre-school part-time.

The parties separated for about a month in January of 2002, when the husband told the wife he wanted a divorce. After one final reconciliation effort, the final separation occurred on Easter weekend 2002. The ensuing divorce proceedings have been particularly contentious. A Special Master conducted exhaustive hearings to characterize and divide the marital estate. Both parties objected to the Master's report, and the Court ordered psychiatric evaluations of both parties. Mediation of the child custody issues, also court-ordered, was unsuccessful. The trial of the cause consumed several days, in addition to extensive pre- and post-trial proceedings.

Appellate courts will defer to the trial court's decisions in divorce cases unless they are inconsistent with the statutory factors or are not supported by a preponderance of the evidence. *Kinard v. Kinard,* 986 S.W.2d 220, 213 (Tenn. Ct. App. 1998). Moreover, the Court will set aside a discretionary decision that rests on an inadequate evidentiary foundation or is contrary to the law. *State ex rel. Vaughn v. Kaatrude*, 21 S.W.3d 244, 248 (Tenn. Ct. App. 2000); *Troglen v. Troglen*, 2005 WL 990567 (Tenn. Ct. App. Apr. 28 2005).

Custody and visitation issues are within the broad discretion of the trial court, whose decision "will be upheld so long as reasonable minds can disagree as to propriety of the decision made." *Eldridge v. Eldridge*, 42 S.W.3d 82 (Tenn. 2001)., *quoting, State v. Scott,* 33 S.W.3d 746, 752 (Tenn. 2000). Abuse of discretion occurs when the trial court applies an incorrect legal standard, or reaches a decision which is against logic or reasoning that causes an injustice to the party complaining. *Id., citing*, *State v. Shirley,* 6 S.W.3d 243, 247 (Tenn. 1999). The appellate court's function is not to "tweak" a decision in the hopes of achieving a better or more reasonable result. *Eldridge,* 42 S.W.3d *at 88.* In custody matters, however, the appellate court will intervene where it finds "a palpable abuse of discretion, or a judgment against the great weight of the evidence." *Cecil v. State ex. rel. Cecil*, 237 S.W.2d 558, 559 (Tenn.1951).

Husband has appealed several aspects of the Permanent Parenting Plan and Final Decree. Primarily, he seeks a more equally divided allocation of residential parenting time, both in the regular weekly schedule, and on holidays and special days. He also seeks joint decision-making authority, and appeals a ruling that the girls must be continuously, personally supervised by him, i.e., no substitute care givers are permitted while the children are in his care.

The Trial Court concluded from the experts' testimony, that the children need "sameness and consistency" with as little change as possible in their lives, and returned to this reasoning repeatedly as a basis for decisions regarding parenting issues, property division and alimony.

Two experts who had been extensively involved in the children's evaluation and treatment testified. Dr. William Allen is a psychologist with special expertise in autism, and oversees the twins' treatment plans and goals, and has provided direct treatment services, as well. Dr. Mary Michael is a pediatric psychiatrist who works closely with the treatment team, monitoring the twins' progress and advising the parents. Toni Alosio, one of the children's teachers who specializes in teaching autistic children, also testified.

The Trial Court found that "sameness and consistency" in the children's routine is necessary, and that a slight change would have a "negative and adverse impact on them." While the evidence shows this is a valid concern, this conclusion takes the experts' testimony out of context.

Dr. Allen classified the girls as high functioning and having a milder form of disorder, and Angelique is clearly more impaired than Anastasia. Although only one-third of children with this diagnosis ever become fully independent as adults, Dr. Allan was optimistic regarding Anastasia becoming an independent adult and holding a job, and was "guardedly optimistic" in Angelique's prognosis.

Dr. Allen's testimony was clear that when autistic children are subjected to changes, such as major disruptions in their schedule, they often experience a setback, or re-emergence of symptoms for a period of 2 to 3 weeks, maximum. The regression is never permanent, and may be triggered in response to such things as a Christmas or spring break, moving to a new house or summer schedule changes. Moreover, if the children are exposed to multiple and simultaneous changes, for example moving to a new house during Christmas break, the duration of the symptom regression period does not increase, only the intensity of the reaction may increase. .

Husband seeks primary residential custody, or in the alternative, a more equal allocation of parenting time, which is a "week about" schedule. Dr. Allen saw no problem with the children going to school from either parent's home or splitting the days in either home, emphasizing that the goal is to be consistent in terms of the same days and working within the school schedule. He did reject the notion of seven days in one home and seven in the other in rotation.

Dr. Michael opined that the rhythm of the schedule is the important issue; and she reflected on the importance that the girls have two parents that care of them, and they experience a regular routine. Both experts conceded on cross-examination, that there was no harm posed by continuing the then current parenting arrangement.

In the temporary arrangement, the husband had every other weekend and alternating

Wednesdays with the children. The wife testified that "as a mother", she felt the children needed to be with their father more, and that he wanted to be with them, and that is why she felt a proposed permanent parenting plan giving the husband slightly more residential time than he had under the temporary plan was "a fair plan". The Trial Court found the temporary schedule in place during their post-separation period was working relatively well, and complimented the parties on their ability to work with the Temporary Parenting Plan, despite their disagreement with it.

We conclude that the evidence does not preponderate against the Trial Judge's ultimate order relating to custody, visitation and decision making as to the welfare of the children.

Husband requests a full week of residential time during Christmas breaks, and objects to the schedule on the girls' birthday. Under the adopted plan, depending on whether their birthday falls on a school day, he is given up to 3 or 6 hours with them.

In post-trial proceedings the Court increased the husband's weekend residential time from Friday evening through Sunday, on alternate weekends, and moved the mid-week to include Tuesday night through Wednesday 6:00 p.m. The plan was modified to add alternating spring break vacations, where previously the husband had no spring breaks. The Court gave no explanation why a week at Christmas differed from the other changes he made in the schedule. We conclude that these rulings were within the Trial Court's discretion, and we affirm the Trial Court on this issue.

The Trial Court ordered that the children must be in the husband's continuous supervision while he has them, which means that the husband must be physically present with the twins at all times when they are in his care. This decision was apparently based on the wife's objection to Ms. Carter's (husband's girlfriend) contact with the children. However, there is no evidence to conclude that Carter, who is a nurse and a mother, poses a danger or harm to the children, or that she is incapable of caring for the children if the need arose.

Dr. Michael testified that she had observed no negative impact from Ms. Carter's or any other female's interaction with the children, so long as that person cared about them and stayed consistent with the parents' methods. Moreover, she stated that there was no risk to them if they are cared for by a female who is not their mother in the husband's home, so long as all are on the same wavelength. The evidence does not support the conclusion that the twins would suffer some harm or be in danger if someone other than husband cared for them for a few hours. More importantly, the proof preponderates against any conclusion that husband cannot exercise good judgment and select capable substitute care givers if he needs to be absent for a few hours. We conclude the Court's Order is too restrictive and hold that the husband may utilize another caretaker, should it be necessary that he be away from the children for a few hours while they are in his custody.

Finally, the husband argues that he wants more input into the major decisions regarding the children. However, we conclude that the Trial Court's decision was well within the Trial Court's discretion, especially since the parties do not seem to be able to work together on making joint decisions.

Appellate courts are disinclined to second-guess trial court decisions regarding spousal support and property division "unless they are not supported by the evidence or are contrary to the public policies reflected in the statutes governing spousal support," *Wilson v. Moore,* 929 S.W.2d 367, 375 (Tenn. Ct. App. 1996), or unless "there is a clear showing that the trial court, in its discretion, reached the wrong conclusion with the result that a manifest injustice will be done if the trial court's decision is allowed to stand." *Butler v. Butler,* 680 S.W.2d 467, 469 -470 (Tenn. Ct. App.1984) (citations omitted); *Perry v. Perry,* 114 S.W.3d 465, 467 (Tenn. 2003).

An exhaustive proceeding was held by the Special Master over two days to characterize and divide the bulk of the tangible personalty. Agreements were reached on the distribution of some items; others were agreed to be sold and the proceeds evenly divided. With respect to the remaining disputed items, the Special Master awarded husband items with a total value of $28,575.00 from the marital property. His vehicle was $20,075.00 of that amount. The Special Master awarded the wife marital personalty valued at $50,250.00, of which her automobile comprised $33,250.00.

Both parties objected to the Special Master's report, and the Trial Court, after hearing arguments, found that the husband's separate property consisted of silver Wallace utensils; a watch valued at approximately $15,000.00; the Paine Webber investment account was valued at $400,000.00; and his law practice valued at $10,000.00. The wife's separate property not otherwise agreed upon was 3 ½ acres of inherited property located in Virginia. The Court then detailed costs and debts assigned to the husband, and from the marital assets the husband was awarded by the Trial Court, a 40% interest in the marital residence, $3, 515.00 in a SEP IRA (50%); $500.00 as ½ interest in LaGuardia Administrative Group; $10,000.00 marital equity the court determined in his separate residence should be included; and $2,500.00 cash in a safe.

The Trial Court awarded wife additional marital personalty valued at $18,000.00; the dining room furniture valued at $10,000.00; one half of the SEP IRA valued at $3,515.00; one-half value of interest in LaGuardia Administrative Group valued at $500.00; $2,500.00 other cash; and a 60% interest in the marital residence.

The wife was onerated with the responsibility for 40% of the property taxes and insurance on the marital residence, and the Court ruled that she may remain in the house until the children reach the age of 18, possibly longer if she petitions the Court. The Court further held the wife could petition to sell the house earlier if she determined that it would be to the children's benefit. The basis for the Court's ruling was the Court's conclusion that it is imperative that the children experience as much "sameness and consistency" in their environment as possible.

The husband testified that a substantial part of his current net worth is tied up in the house. The wife, in her Rule 9 proposal, requested that she remain in the house for five years, and on direct examination she stated that she could be prepared to move in 2 to 5 years. But when pressed by the Court's questioning she said that she would like to remain in the house until the girls turn 18.

She also testified that if she were not awarded the marital home she would move into the city, which would require a complete change of schools, and other changes. She conceded on cross-examination that nothing would require her to move out of the school district. Moreover, the record indicated that the children will have changed schools as of May, 2005.

It is noted that neither Drs. Allen nor Michael testified that it was in the best interest of the children to either move from or stay in the marital residence.

The expert testimony is not disputed that while the twins would encounter some adjustment by moving, they would suffer no permanent harm; any symptom regression would last two to four weeks, and Dr. Allen declined to recommend to the Court that they not be moved. He testified that he was not recommending that the Court make no changes in the children's situation; just that whatever change occurred would be accomplished all at once, rather than over a series of gradual changes which would be more disruptive to special needs children.

Neither Dr. Allen nor Dr. Michael opined that it was in any way essential for the girls' well-being to remain in this particular house. They freely acknowledged that moving to a new home is a change that commonly occurs in divorce situations, and that autistic children, as do other children, can and do learn to adjust to it without any lasting damage. Special needs children merely require some extra preparation and attention during the transition.

The house is now twenty years old. The husband was ordered to pay for all repairs and maintenance in excess of $500.00. The Decree provides that the husband may inspect the premises to determine if a particular repair or maintenance is actually needed, and to re-inspect it again after the work is completed. He is also permitted to conduct separate bi-annual inspections for the sole purpose of evaluating the overall need for maintenance. Despite noting on several instances during the proceedings that "these parties can't agree on the time of day," and that everything that could possibly be contested in this case was litigated, the Court ordered the parties to agree on the issues of maintaining and preserving the house, and if they could not agree, then they must submit the matter to non-binding mediation before seeking court relief.

Joint ownership of the house will keep the parties entangled with each other for years, and may invite disputes over whether a repair is needed, e.g., what a reasonable cost is; whether the wife intentionally allowed a condition to deteriorate in order to increase the expense to reach $500.00; and whether a particular situation is a single condition, or a series of discrete conditions, each costing less than $500.00. An example in the record is the post-trial dispute concerning the painting of the garage doors. The parties disagreed over the color that should be used, the quality of work indicated by the estimates, and whether the repair aspect and painting aspect were two separate items, or a single condition. Another example was the wife's threat to cut down certain large hemlock trees and landscaping hedges if the husband refused to pay for the trimming. Under the present arrangement, these type of conflicts can only be expected to intensify over the years. We agree with the Court's valuation of the home and that the Court's division of this marital property was appropriate. However, the evidence preponderates against the Court's

determination that the children's condition requires that they remain in the home until age 18 or beyond. Joint ownership will be a catalyst for exacerbating disputes between the parents and arguably, the best interest of the children would not be served by continual turmoil between their parents. Accordingly, we conclude that the home should be sold and the proceeds divided, which is to be accomplished within two years of this Judgment becoming final. The parties are to prepare the children for this change by following the advices and direction of the experts on conditioning the children.

The husband was charged with substantial debts, including wife's credit cards, the equity line of credit, attorney fees and litigation expenses and all court costs. He is obligated for health and dental expenses and insurance premiums and deductibles, and a life insurance policy for the children, in addition to regular child support. He did not appeal any of these issues, and while he has appealed the overall allocation of the marital estate, we conclude without detailed analysis that the division of the marital estate was equitable and we affirm the Trial Court on this issue.[1]

Husband next argues that it was error to designate as alimony Wife's health insurance premiums that he was ordered to pay for 24 months. He argues that the Court ruled *sua sponte* on an oral motion that was not property noticed under the rules of civil procedure.[2]

We have held that it is not reversible error for the trial court to specifically designate that a portion of alimony payments be directed to the payment of insurance premiums. *Watters v. Watters,* 959 S.W.2d 585, 593 (Tenn. Ct. App. 1997); *Wiltse v. Wiltse,* 2004 WL 1908803 at *7 (Tenn. Ct. App. 2004); *also see, Wilson v. Moore,* 929 S.W.2d 367, 375 (Tenn. Ct. App. 1996). As to this issue, the husband does not explain how he is harmed by the ruling. The rules of civil procedure are designed to secure the just, speedy and inexpensive resolution of disputes. *Tenn. R. Civ. P. 1.* To order a rehearing merely to comply with notice requirements on an issue where the husband has shown no appreciable harm and would be unlikely to prevail on the merits, is a waste of judicial resources. We hold this issue to be without merit.

The husband appeals the judgment of alimony *in futuro* of $1,000.00 per month awarded to the wife.

While affording wide latitude to trial courts' spousal support and maintenance decisions, appellate courts scrutinize such rulings "to determine whether they reflect a proper application of the relevant legal principles and whether they are supported by a preponderance of the evidence." *Crain v. Crain,* 925 S.W.2d 232 (Tenn. Ct. App. 1996); *Cranford v. Cranford,* 772 S.W.2d 48, 50 (Tenn. Ct. App. 1989). We are disinclined to interfere with alimony decisions, except to determine whether the decision is based in law or fact and is therefore not arbitrary, illogical, or

---

[1] For example, the Trial Court held that $10,000.00 in marital funds were used to purchase the husband's separate residence. The husband argues the record does not substantiate this finding. Assuming, arguendo, the Trial Court's ruling was in error, the overall division of the marital property between the parties remains an equitable division.

[2] The payments of $134.50 per month were to be concluded as of May 2005.

unconscionable. *Norman v. Norman,* 2003 WL 724677 at *8 (Tenn. Ct. App. Mar. 4, 2003).

Alimony decisions are mixed questions of law and fact. *Aaron v. Aaron,* 909 S.W.2d 408, 410 (Tenn. 1995). Here the Court found that the wife is economically disadvantaged and that rehabilitation was not feasible. The Trial Court found that the husband's net monthly income is $7,281.00 and based the award of *in futuro* alimony support on finding that she did not work during the marriage, that she has "very minimal" earning capacity, and the children's special needs mandate that the wife be a full time mother.

Spousal support is designed to aid a disadvantaged spouse to become and remain self-sufficient, but if self-sufficiency is not possible, then alimony *in futuro* will mitigate the harsh economic realities of divorce. *Anderton v. Anderton,* 988 S.W.2d 675 (Tenn. Ct. App. 1998); *also see*, *Kinard,* 986 S.W.2d at 234.

In this case, the Trial Court noted that the wife is 40 years old and will be caring for the children for several years. Also there is a large disparity in the parties' earning capacity along with her limited work history, and no marketable job skills except for her college degree. The appellant cites cases where the courts have rejected such factors as a basis for permanent alimony. *See Tarkington v. Tarkington*, 1998 WL 44951 (Tenn. Ct. App. Feb. 6, 1998); *Mueller v. Mueller*, 2004 WL 2609197 (Tenn. Ct. App. Nov. 7, 2004); *Crain v. Crain*, 925 S.W.2d 232 (Tenn. Ct. App. 1996). We will not disturb the Trial Court's award of alimony *pro tanto* as hereinafter explained.[3]

Trial courts may properly adjust the division of marital property in order to assist in meeting a disadvantaged spouse's financial needs where there is a disparity between the relative earning capacity of the parties. *Robertson v. Robertson,* 76 S.W.3d 337, 340 (Tenn. 2002); *Crabtree v. Crabtree*, 16 S.W.3d 356, 361 (Tenn. 2000). The Trial Court obviously adjusted the division of the marital estate as the *Robertson* Court encouraged trial judges to do. Under the Trial Court's Order, the wife was awarded a 60% interest in the residence, but only pays 40% of the taxes and insurance, and the husband essentially pays for repairs and maintenance. Since we have directed that the house be sold and the proceeds divided within two years of this Judgment, the Trial Court will be required to reconsider the alimony award as to amount and duration following the sale of the house, since under the Trial Court's Judgment, she would be expected to live on $1,000.00 a month, plus the child support. In other words, when the house is sold the Trial Court is directed to establish an alimony award based upon the needs of the wife and the ability of the husband to pay.

The wife has also appealed, arguing the Trial Court should have designated the huband's law practice as marital property. Apparently she does not seek a share of it, only that it should be classified as part of the husband's distributive share of the marital estate. An interest in a professional practice is generally considered a marital asset. *Batson v. Batson,* 769 S.W.2d 849 (Tenn. Ct. App. 1988); *Hazard v. Hazard,* 833 S.W.2d 911, 915 (Tenn. Ct. App. 1991); *Smith v.*

---

[3]The record shows the husband pays $2,330.00 per month in child support, maintains their health insurance, and pays 80% of any uninsured medical expenses up to $1,000.00 and 100% of all amounts over $1,000.00.

*Smith,* 709 S.W.2d 588 (Tenn. Ct. App. 1985). It is wife's contention that because there is no evidence of the source of funding the practice, the presumption is that it is marital. This presumption is rebutted by the fact that the proof establishes that the parties could not live within the means of husband's employment income, but relied on his separate assets for regular financial support as well as making separate investments.

We conclude this issue is without merit.

Further, the wife argues the Paine-Webber Investment account is marital property subject to division because the account was briefly in her name in 1991. The Trial Court stated that it "buys" that wife put her name on husband's account without his knowledge, and dismissed it as a "mistake." This issue is also without merit.

The Judgement of the Trial Court is affirmed, as modified, and the cause remanded. The cost of the appeal is assessed one-half to Sandra Jane LaGuardia and one-half to Michael J. LaGuardia.

_____
HERSCHEL PICKENS FRANKS, P.J.